IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DEBRA S.,[1] | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
| v. | )    Civil Action No. 7:23-CV-161 |
| | ) |
| MARTIN O'MALLEY, | )    By: Hon. Michael F. Urbanski |
| Commissioner of Social Security,[2] | )    Chief United States District Judge |
| | ) |
|     Defendant | ) |

## MEMORANDUM OPINION

Plaintiff Debra S. ("Debra") filed this action challenging the final decision of the Commissioner of Social Security denying her claim for a period of disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 423 and 1381a. In her motion for summary judgment, ECF No. 13, Debra argues that the determination of the administrative law judge ("ALJ") that she is not disabled, is not supported by substantial evidence. The Commissioner also has filed a motion for summary judgment and argues that substantial evidence supports the ALJ's determination that Debra is not disabled. ECF No. 18.

As discussed more fully below, the court finds that substantial evidence supports the ALJ's determination that Debra is not disabled. Accordingly, Debra's motion for summary

---

[1] Due to privacy concerns, the court adopts the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] Martin O'Malley was named the Commissioner of Social Security on December 18, 2023. In accordance with Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), he is substituted as defendant.

judgment is **DENIED**; the Commissioner's motion for summary judgment is **GRANTED;** and the Commissioner's determination that Debra is not disabled is **AFFIRMED**.

### I. Judicial Review of Social Security Determinations

It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet her burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). The court will uphold a Social Security disability determination if "'(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings.'" Oakes v. Kijakazi, 70 F.4th 207, 212 (4th Cir. 2023) (quoting Arakas v. Comm'r Soc. Sec. Admin., 983 F.3d 83, 94 (4th Cir. 2020)).

A court may neither undertake a de novo review of the Commissioner's decision, reweigh conflicting evidence, or substitute its judgment for that of the ALJ. Id. Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Laws, 368 F.2d at 642. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S.

2

197, 229 (1938)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

Nevertheless, the court does not "'reflexively rubber-stamp an ALJ's findings." Oakes, 70 F.4th at 212 (quoting Arakas, 983 F.3d at 95). Remand is appropriate when the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." See Mascio v. Colvin, 780 F.3d 632, 636–37 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"). See also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted).

## II. Claim History

Debra was born in 1982 and graduated from high school. R. 345, 390. She has no past relevant work because she was found to be disabled in 2003 when she was 20 years old due to recurrent nephrolithiasis,[3] which the ALJ determined would cause her to miss work between two and six days per month. R. 152. At some point prior to 2019, her disability benefits were terminated, which prompted her to file a new application. R. 85, 345–50.

---

[3] Nephrolithiasis is commonly known as kidney stones, which are hard deposits made of minerals and salts that form inside the kidneys. https://www.mayoclinic.org/diseases-conditions/kidney-stones/symptoms-causes/syc-20355755 (last viewed Feb. 7, 2024).

Debra filed her current application for benefits on November 8, 2019, alleging an onset date of February 14, 2018. She alleges disability based on cystinuria,[4] a blood clotting disorder, and a "former blood clot in jugular and chest cavity-scar tissue." R. 389. Her reported symptoms include pain caused by multiple surgeries on her kidneys, and by the passing of small stone particles every day, with greater pain when the stones are larger. Debra also alleged anxiety, lack of energy caused by her medication, and inability to concentrate. R. 402.

The application was denied at the initial and reconsideration levels, as well as after an initial hearing. R. 184–199, 208–220, 158–172. On January 27, 2022, the Appeals Council remanded the case to the ALJ for resolution of two issues. First, the hearing determination did not contain a discussion of the findings from the 2003 ALJ determination that Debra was disabled, as is called for by Acquiescence Ruling 00-1(4); see Albright v. Comm. of the Soc. Sec. Admin., 174 F.3d 473 (4th Cir. 1999). Order of Appeals Council, R. 178. Second, in evaluating Debra's symptoms, the ALJ had stated that she had missed urology appointments, the doctor's office had received an anonymous tip that she was selling her medications, she made an early refill request of her narcotic pain medication, and there were issues regarding her pill counts. The Appeals Council found that allegations of criminal behavior, questions regarding medication misuse, and possible issues with treatment compliance should not have been assessed as part of the symptom evaluation. R. 179.

---

[4] "Cystinuria is an inherited metabolic disorder characterized by excessive amounts of undissolved cystine in the urine, as well as three chemically similar amino acids: arginine, lysine, and ornithine. Excess cystine in the urine can lead to the formation of crystals and stones (calculi) in the kidney, bladder, and/or urinary tract (ureters). Some people with cystinuria do not form stones, while others frequently form stones." https://rarediseases.org/rare-diseases/cystinuria/ (last viewed Feb. 7, 2024).

4

On July 7, 2022, the ALJ held a second hearing and on July 28, 2022, issued a determination that Debra is not disabled. The ALJ applied the five-step evaluation process described in the regulations. R. 15–29.[5] The ALJ first found that regarding Debra's DIB claim, she met the insured status requirements through September 30, 2019, R. 16, and she had not engaged in substantial gainful activity during the period since February 14, 2018, her alleged onset date. The ALJ further found that Debra's diagnosis of cystinuria is a severe impairment, but that it did not meet or medically equal the severity of a listed impairment. R. 20–21. The ALJ found Debra's other alleged impairments to be non-severe, R. 18–20, and Debra does not challenge this finding.[6]

The ALJ then found that Debra had the residual functional capacity ("RFC") to do light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could only occasionally perform postural activities and was expected to be absent from work one day per month. Debra had no past relevant work, but the ALJ found that jobs in the national economy

---

[5] The ALJ makes a series of determinations: (1) Whether the claimant is engaged in substantial gainful activity; (2) Whether the claimant has a medically determinable impairment that is "severe" under the regulations; (3) Whether the severe impairment or combination of impairments meets or medically equals the criteria of a listed impairment; (4) Whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) Whether the claimant is able to do any other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a) and 416.920(a). If the ALJ finds that the claimant has been engaged in substantial gainful activity at Step 1 or finds that the impairments are not severe at Step 2, the process ends with a finding of "not disabled." Mascio v. Colvin, 780 F.3d 632, 634-635 (4th Cir. 2015). At Step 3, if the ALJ finds that the claimant's impairments meet or equal a listed impairment, the claimant will be found disabled. Id. at 635. If the analysis proceeds to Step 4 and the ALJ determines the claimant's RFC will allow him to return to his past relevant work, the claimant will be found "not disabled." If the claimant cannot return to his past relevant work, the ALJ then determines, often based on testimony from a vocational expert, whether other work exists for the claimant in the national economy. Id. The claimant bears the burden of proof on the first three steps and the burden shifts to the Commissioner on the fifth step. Id.

[6] The ALJ also addressed the issues raised by the Appeals Council when it remanded the case, but the ALJ's assessment of the issues is not contested by either party.

existed for her, such as that of a small parts assembler, laundry folder, and cashier II. Thus, the ALJ found Debra not disabled. R. 21–28. Debra sought review from the Appeal's Council, which denied review on February 2, 2023. R. 1–3. This lawsuit followed.

### III. Evidence

### A. Medical Records

On September 28, 2015, Debra saw a urologist with complaints of flank pain. It was noted that she had a history of recurrent kidney stones and a history of a blood clotting disorder. She had last been seen in June 2014. R. 762. She had previously undergone a lithotripsy procedure to break up stones in the kidney and parts of the ureter, a ureter endoscopy through ureterotomy to remove stones, a port-a-cath, and a cystoscopy with uteroscopy with holmium laser lithotripsy. The most recent procedure had occurred in October 2013. R. 762–63.[7] In addition, she had previous diagnoses of neuralgic migraines, ovarian cyst, embolism, chronic pain, and a personal history of deep vein thrombosis. R. 763.

At a February 2016 visit to the urologist, it was noted that Debra's last episode of flank pain was in September 2015 and had resolved quickly. R. 750. In April 2017 she was doing well with no renal colic "for at least two years." R. 737. A renal ultrasound showed two normal kidneys with only a questionable 3 mm. lower pole echo. Id.

In May 2019 Debra went to the emergency department complaining of right flank pain, nausea, and painful urination. R. 588. A CT scan showed an obstructing 2 mm calculus within

---

[7] Other notes in the record indicate that Debra underwent a percutaneous cystotomy in 2014, R. 498, 535, and percutaneous removal of a staghorn calculi in 2016. R. 879.

6

the distal right ureter, resulting in right hydronephrosis and perinephric stranding. Additional non-obstructing calculi were present in the lower pole of both kidneys. R. 593. She was discharged to go to the nephrology clinic. R. 594. At the clinic, she passed the stone and started feeling much better. R. 497.

In June 2019 she returned to the emergency department complaining of right abdominal and right flank pain. R. 641. She passed a stone while in the emergency department and felt better. R. 496. She was given morphine and Phenergan and discharged home. R. 644.

On April 30, 2022, Debra went to the emergency department with complaints of left flank pain radiating down to her left lower quadrant for the previous two days. R. 1208. A CT scan showed two adjacent left mid-ureteral obstructing stones measuring 9 mm and 11 mm resulting in mild left hydronephrosis. There was also a non-obstructing left inferior pole nephrolithiasis. R. 1213. She was discharged home with medication and advised to contact her urologist. R. 1213–14.

Debra returned to the emergency department the next day with increased pain. R. 1284. She was admitted to the hospital with a diagnosis of acute obstructive uropathy, acute left flank pain, and an acute urinary tract infection. R. 1333–34. On May 2, 2022, she underwent a cystoscopy, left retrograde pyelogram, and left ureteral stent placement. R. 1349. She was discharged home with medications and was directed to follow up in the clinic to schedule a definitive stone surgery. R. 1350. On May 20, 2022, Debra reported she was having stent irritation with dysuria and discomfort. R. 1352. She underwent a left ureteroscopy with laser lithotripsy and basket extraction, in which the stent placed three weeks earlier was removed, a

7

laser was used to break up the large stones into smaller particles which were removed with a "basket," and a new stent was placed, which was to remain in place for one week. R. 1359–60.

On June 1, 2022, the new stent was removed. R. 1362. Analysis of the removed stones showed that they were cystine, and stone prevention was discussed with Debra. She had not undergone a metabolic workup for more than twenty years for possible stone prevention medication. She was advised to drink two to three liters of water or lemonade per day and to maintain normal calcium intake. R. 1366–67.

In the meantime, Debra began seeing Anthony Dragovich, M.D., a pain management specialist, sometime prior to March 2017. In a note from March 6, 2017, Dr. Dragovich stated that Debra was at the clinic for a follow-up visit for abdominal pain. She had been diagnosed with cystinuria and had had more than 300 stones. She reported multiple lithotripsies and cystoscopies and had undergone her first percutaneous removal of a staghorn calculi. She had been taking oxycodone and methadone for more than ten years and the medications helped with her pain. She also had a blood-clotting disorder which was treated with Coumadin. She reported to Dr. Dragovich that she was able to perform cooking, cleaning, and personal hygiene. She rated her pain as a "4" on a scale of 1 to 10, and described it as having "an aching, a sharp, a shooting, a stabbing, and a burning quality and does not radiate." She also reported that she was fatigued but denied having any other issues. R. 879–80. The only finding on physical examination was that her left flank was tender to palpation. Dr. Dragovich diagnosed Debra with abdominal pain, kidney stones, and chronic pain. At that time, Debra was taking 25 mg. of methadone every eight hours and 30 mg. of oxycodone every 4 hours. R. 881.

8

Debra continued to see Dr. Dragovich or one of his associates every month or two through at least February 2022. See R. 880–1195. She typically described her pain as being "4," "5," or "6" on a scale of 1 to 10. At every visit her activity level was described as "able to perform cooking, cleaning, and personal hygiene." The only complaint ever noted (in addition to pain) was fatigue. She consistently had a full range of motion and her paraspinal muscle strength and tone were within normal limits and with very few exceptions, the only tenderness she reported was over her left flank.

In April 2018, Dr. Dragovich began to wean Debra off the oxycodone and discontinued her alprazolam prescription. R. 926. By October 2018 she was no longer taking Oxycodone and her only pain medication was 25 mg. of methadone every eight hours. R. 954. Although Debra said she was not happy with the discontinuation of oxycodone, Dr. Dragovich stated that she appeared to be doing fairly well with weaning off the alprazolam and oxycodone. When Debra had her kidney stone episode in May 2019, she was prescribed oxycodone and after that time she continued to take 10 mg. every four hours as needed for pain. R. 990.

At a visit with physician's assistant Dana Adams on March 11, 2020, under "History of Present Illness," it was noted that Debra had tenderness on palpation, her range of motion was moderately limited, and she had paraspinal muscle spasm although her paraspinal muscle tone was within normal limits. She had weakness and decreased tone in both lower extremities. Her reflexes were normal, but she had reduced sensation to light touch. Her gait was described as "wobbly," and she walked with the assistance of a cane. She had severe pain with percussion

9

over her lower spine. Her activity level was described as "able to perform cooking, cleaning, and personal hygiene" and also described as "improved 50 %." R. 1021.

On examination, Debra had a normal range of motion in all joints, her left flank was tender to palpation but her paraspinal musculature was described as "nontender to palpation," her paraspinal muscle strength and tone were within normal limits, and she had no pain or joint crepitus in her upper extremities. She was described as "doing very well" and she was living on her grandmother's land in West Virginia with her children. R. 1022.

In May 2020 Dr. Dragovich noted that Debra had moved back to Virginia, was doing very well overall, and was able to take care of herself and her family. She reported that her pain medications reduced her pain by 50 percent and allowed her to have increased function and decreased pain-related disability. She said she still suffered from frequent kidney stones, but the pain was improved with her medications. She said she had been more active and had lost weight. R. 1018. On examination, her back was tender to palpation over her lumbar-sacral spine, she had decreased range of motion in her lumbar spine, and increased pain with axial loading, extension, and rotation. Her gait and balance were normal. R. 1019.

On December 29, 2020, Debra was "doing very well with no complaints." R. 1058. Examination showed no tenderness to palpation in her lumbar spine or lumbar paraspinals. She did have tenderness along the flanks with the left worse than the right. She had good range of motion in her lumbar spine. R. 1059. In January 2021 she reported good days and bad days, and her physical examination remained the same. R. 1061.

10

On April 23, 2021, Debra rated her pain as a 5, defined as "moderate but tolerable," and said her medications were 40 percent effective at reducing pain. Her physical examination was the same as at the last visit. R. 1094–95.

On April 27, 2021, Dr. Dragovich completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." In the assessment, Dr. Dragovich indicated that Debra could occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds. She could stand and walk 2 hours in an 8-hour workday and sit for 2 hours in an 8-hour workday. She would need to rest a total of 1 hour during an 8-hour workday, in addition to a normal lunch break and work breaks, to relieve pain and fatigue. Her ability to push and pull were limited by severe back and renal pain which were aggravated by activity. She could occasionally balance and kneel, but never climb, crouch, crawl, or stoop because of her severe back and renal pain. She was expected to be absent from work more than three times per month. Her condition had existed and persisted since at least February 14, 2018. Dr. Dragovich said that he had seen Debra monthly since he first began treating her. R. 1089–93.

Debra returned to Dr. Dragovich's office for medication checks in June, August, and October 2021. The only abnormal finding was flank tenderness to palpation with the left worse than the right. R. 1116–17. Debra was assessed with analgesic use, chronic prescription opiate use, chronic pain, chronic pain syndrome, tobacco use, overweight, and pain syndrome, chronic. R. 1118.

In February 2022 Debra rated her pain as a "4," but rated it as a "7" for interfering with her sleep and with her daily activities. She said her medication was 60 percent effective at

11

reducing her pain. She was described as "overall … doing very well with no complaints." R. 1101.

### B. Hearing Testimony

At the first hearing held on May 12, 2021, Debra's attorney told the ALJ that although Debra had been diagnosed with a blood-clotting disorder, it was being treated with Coumadin and she had not experienced any recent issues. Also, she had a seizure after delivering her last child in 2017, but it was believed the seizure was caused by taking her off one of her medications too quickly. In addition, she had a history of anxiety and depression but was not receiving ongoing treatment for those issues. R. 78.

Debra testified that she was 38 years old and had graduated from high school. She had not worked because she was found disabled when she was 20 years old. Her disability payments ended when the Social Security Administration found she was no longer disabled, but Debra did not know the basis for that determination. R. 80.

She testified that sometimes she would have one kidney stone a month, but other times would have 20 stones in a month. She said she is in constant pain and that her kidneys are damaged because she has had "30-plus" surgeries, which have resulted in scar tissue, and a treatment provider has told her that the scar tissue is causing a lot of pain. In addition to flank pain, she also has some pain in her knee and low back. When a stone is moving, it causes constant sharp stabbing pain, but most of the time is like a "bad, dull ache or something." R. 80–82.

The pain makes it difficult to sit and stand and she needs to change position often, sometimes as often as every 10 or 15 minutes, while other times she can be in the same position for an hour or more. If she is passing a stone, she is up and down constantly. R. 82.

She often must lie down during the day, typically for half an hour three times a day. On a bad day she had to lie down more frequently, and typically is lying down for fifteen to twenty minutes at a time. R. 82–83. Although she was not receiving treatment for anxiety and depression, she was looking into obtaining treatment. R. 84. Pain interfered with her ability to sleep at night, and she was often drowsy and unable to concentrate the next day. R. 85.

She lived alone with her two children, ages 11 and 3, and next door to her father. When she had a bad day, her parents would step in and help and they also helped drive her son back and forth to school. She could cook, wash dishes, and do laundry most of the time, but not all the time. Bending over to wash dishes or do laundry caused pain. Some days she could not do anything at all and her son would heat something in the microwave for dinner. When she does chores, she has to stop every seven or eight minutes and rest anywhere from ten to thirty minutes. R. 87. Although she did not currently have a driver's license for reasons unrelated to her impairments, when she did have a license, she would need to stop the car and walk around every hour or so when traveling. R. 88. Once or twice a month she was unable to get out of bed at all and either her parents or her children's father came over to help her out. R. 89.

In 2019, Debra's grandmother was ill and on dialysis and Debra and her mother cared for her. Although Debra's mother was the primary caregiver, once or twice every two weeks Debra would help with her grandmother's care, but she was able to lie down on the couch

13

during the dialysis treatment. R. 90–91. When doing the treatments, she would set up the machine with her grandfather's help, put a catheter in her grandmother's arm, hook up the tubing, check her blood pressure every 30 minutes, and otherwise monitor her. Her grandfather helped with all of it. R. 91–92. The machine sat on a cart and they did not need to move it much. Debra helped care for her grandmother for six or seven months. During that time, she did not cook or do any cleaning around the house. She sometimes took her 2-year-old daughter with her to her grandmother's house, but other times she and Debra's son would stay with their father. R. 92–94.

The vocational expert (VE) testified that Debra could do the work of a small parts assembler, a laundry folder, or a cashier II, all of which were light, had a specific vocational preparation of 2, and existed in significant numbers in the national economy. Generally, an employer will tolerate an employee being off task up to ten percent of the time and absent from work once per month. If an employee needed to lie down for half an hour during the day, she would be unable to sustain employment. R. 95–96.

Following remand, a second ALJ hearing was held on July 7, 2022. Debra testified about the painful kidney stone episode she had in 2022 where she had multiple procedures to place stents and the stones were removed with a laser. R. 42–43. She testified that sometimes she needs such treatment a couple of times per year and other times she can go a while without going to the hospital. R. 43–44. Other than the exacerbation described above, her condition had remained about the same, with daily pain from kidney stones and occasional pain in her knees and neck. She still needed to lie down anywhere from two or three times per day to

14

several times per day for 15 to 20 minutes at a time. She still had trouble sleeping because of pain. She also had the same limitations described previously with doing household chores and driving. R. 45–46. She had periods of time when it was hard to get up and get out of bed and it was hard to stay in one position for a long time. R. 47.

Debra said she passes a stone at least once a month, but she does not always know she has a stone. R. 48. She believed that most of her discomfort was caused by the procedures that have damaged her kidneys and the scar tissue caused by the surgeries. R. 47–50.

### C. State Agency Determinations

When state agency experts reviewed Debra's initial application, they found she had the severe medically determinable impairment of "repeated complications of hematological disorders." R. 102–03, 111-12. They determined that she could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand, walk, or sit for about 6 hours of an 8-hour workday, use push and pull controls, and frequently climb, balance, kneel, crouch, and crawl. R. 103–05, 112–14.

On reconsideration, the agency experts found that Debra had the severe impairment of "repeated complications of hematological disorders" and non-severe impairments of epilepsy, depressive, bipolar, and related disorders, and anxiety and obsessive compulsive disorders. R. 122–123, 137. They reached the same conclusions about Debra's RFC as the experts who did the initial evaluation. R. 125–27, 139–41.

## IV. Analysis

The ALJ found that Debra had the RFC to do light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could only occasionally perform postural activities and was expected to be absent from work one day per month.[8] Debra argues that this finding by the ALJ is not supported by substantial evidence. In support of her argument, she contends that the ALJ (1) did not conduct a function-by-function analysis of her ability to do work-related activities; (2) failed to make any specific findings regarding her ability to maintain a static work posture, her need to lie down during the day, or her rate of unacceptable absenteeism, and therefore did not present a proper hypothetical to the vocational expert; (3) erred in his assessment of Dr. Dragovich's opinion of her ability to do work-related activities; (4) provided only a cursory assessment that did not comply with Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 at *2 (July 2, 1996) ("SSR 96-8P") and ignores "significant and substantial evidence" in the record; (5) did not "build the logical bridge" from the evidence to his physical findings; and (6) did not properly assess Debra's subjective complaints of pain and limitations.

A claimant's RFC "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as

---

[8] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. §§ 404.1567, 416.967.

16

pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8P, 1996 WL 374184 at *2. "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a <u>regular and continuing</u> basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." <u>Id.</u> "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." <u>Id.</u>

In assessing the RFC, the adjudicator should consider the claimant's medical history, medical signs, and laboratory findings, the effects of treatment, reported daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured environment, and work evaluations, if available. <u>Id.</u> at *5. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. <u>Id.</u> at *7.

The RFC must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR §§ 404.1545 and 416.945. Only after that may the RFC be expressed in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy. SSR 96-8p, 1996 WL 374184 at *1, 3. Physical abilities set out in 20 C.F.R. 404.1545(b) and 416.945(b) include sitting, standing, walking, lifting, carrying, pushing, pulling,

17

reaching, handling, stooping, and crouching.[9] The ALJ also must explain how he considered and resolved any material inconsistencies or ambiguities in the record. SSR 96-8p, 1996 WL 374184 at *7.

### A. Function-By-Function Analysis

Debra is correct that the ALJ did not do a function-by-function analysis of her ability to do work-related activities. However, there is no per se rule that a case must be remanded when an ALJ does not perform an explicit function-by-function analysis. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). Rather, "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. In Mascio, the case was remanded because the ALJ's assessment of the claimant's RFC did not address conflicting evidence in the record and did not include an analysis of whether the claimant could perform certain functions for an entire workday. Id. at 637.

Here, the ALJ discussed the evidence in detail and explained how he determined that Debra can do light work with additional postural limitations. The ALJ cited to Debra's two function reports, where she stated that she took care of her children and did some housework, but that she would lie down for several hours while her children were at school. She would occasionally fix breakfast and would fix dinner a couple of times per week. She said she did

---

[9] Mental abilities are set out in §§ 404.1545(c) and 416.945(c). Abilities set out in paragraph (d) of the regulation include those affected by skin impairments or epilepsy, impairment of vision, hearing, or other senses, or impairments which impose environmental restrictions.

not have much energy and it was difficult to "stay on track." She would go shopping for groceries and things for her children two or three times per week for an hour at a time, and she attended church. She said she could walk for 100 feet before needing to rest. She described her pain as "moderate" most of the time and "severe" some of the time. Her pain medication made her drowsy. In her reconsideration function report, Debra said she took care of her children with help from her mother and grandfather and prepared microwaveable meals and box dinners. With her mother's help, she did laundry once or twice per week and washed dishes a couple of times per week for a couple of hours with breaks. She could walk for ten or fifteen minutes before needing to stop and rest for five or ten minutes. Back pain made it difficult for her to lift, squat, bend, stand, sit, walk, reach, kneel, or climb stairs for long periods of time. R. 21–22 (citing R. 388–94, 405–06, 421–28). The ALJ also cited to Debra's testimony at the hearings, as set forth above. R. 22.

The ALJ found that Debra's description of her impairments was inconsistent with the record, and that although the record supports the inference that her impairments may cause her pain or other difficulty, the record does not support the conclusion that her symptoms are as severe as she described and indicates that there are other mitigating factors against their negative impact on her ability to do work. R. 23. For example, the ALJ noted that although Debra has received treatment for her impairments, the treatment has been essentially "routine, conservative, and successful." During her visits to the pain management clinic, she indicated that she was doing well and was able to do household activities, including caring for her family and staying active. She often reported a 50 percent decrease in pain with her medication. She

saw her urologist for routine care where she reported symptom improvement. The ALJ cited to her emergency room visits and found that she was always discharged in stable and improved condition. R. 24.

In addition, the ALJ acknowledged that while pain and symptoms are not always accompanied by objective evidence, it can be a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms. Id. (citing Social Security Ruling 16-3P Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017) ("SSR 16-3p"). In Debra's case, diagnostic imaging, testing, and physical examination showed mild or no abnormalities. In 2019 her renal function labs and imaging were negative, records from the pain management clinic overall were normal with only tenderness over her left flank and occasional tenderness in her back with decreased range of motion. Her pain management providers consistently noted that she had a normal gait, negative straight leg testing, and normal strength and tone. At some visits she denied pain, reported symptom improvement, and said she was able to perform activities of daily living, including caring for her family, cooking, and cleaning. Id. The ALJ explained that to provide for the objective examination findings of flank pain and occasional notes of back tenderness and decreased range of motion, he limited her to light work with occasional postural activities and included in his hypothetical to the vocational expert that she would be absent for work one day per month. R. 24.

The court finds that the ALJ adequately explained how he assessed Debra's ability to perform relevant functions and why he found she could do light work with additional postural

limitations. The ALJ's explanation of his determination is clear and supported by the record, and the court is not left to guess at how the ALJ arrived at the RFC. Accordingly, the fact that the ALJ did not provide a function-by-function analysis of Debra's work-related abilities does not warrant remand in this case.

For the same reasons, the court finds that although the ALJ did not make a specific finding regarding Debra's ability to maintain a static work posture, he clearly explained how he arrived at the RFC assessment when he noted that the only objective finding on examination was flank tenderness and occasional back tenderness and that she consistently was noted to have a normal gait, balance, strength, and sensation. In addition, the ALJ noted that Debra gave a description of more robust daily activities without limitations to her providers at the pain management clinic.[10]

Debra argues that the ALJ ignored significant and substantial evidence in the record that was contradictory to his findings, but she does not describe any evidence that was ignored, and the court did not note any relevant evidence that the ALJ failed to discuss. To the extent that Debra is arguing that the ALJ misinterpreted the evidence, she is asking the court to reweigh the evidence or substitute its judgment for that of the ALJ and the court is not at liberty to do that. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1996).

---

[10] Also, contrary to Debra's assertion, the ALJ also made a specific finding of her rate of absenteeism when he found that she would be absent from work one day a month.

21

**B. Consideration of Treating Physician's Opinion**

Debra also argues that the ALJ erred in his assessment of Dr. Dragovich's opinion of her ability to do work-related activities. As set forth above, Dr. Dragovich completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)." He concluded that Debra could occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and walk 2 hours in an 8-hour workday; sit for 2 hours in an 8-hour workday; would need to rest a total of 1 hour during an 8-hour workday in addition to a normal lunch break and work breaks; could not push or pull; could occasionally balance and kneel, but never climb, crouch, crawl, or stoop because of her severe back and renal pain. Dr. Dragovich also stated that Debra was expected to be absent from work more than three times per month. He attributed these limitations to severe back and renal pain aggravated by activity. R. 1089–93.

Under the current regulations, when considering medical opinions, an adjudicator does not defer or give specific evidentiary weight to any medical opinion, including those from a treating source. Rather, the adjudicator must examine the supportability of the opinion by objective medical evidence and supporting explanations presented by the medical source, the consistency of the opinion with the evidence from other medical and non-medical sources in the record, the source's relationship to the claimant, the source's specialization, and any other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c and 416.920c. The most important factors are supportability and consistency. Id. at §§ 404.1520c(a) and 416.920c(a).

22

The ALJ found Dr. Dragovich's opinion to be unpersuasive because it was unsupported by his own objective examination findings and his notes from his encounters with Debra. The ALJ summarized Debra's records from her visits to Dr. Dragovich at the pain management clinic where Debra typically reported that she was doing well and denied symptoms. In 2018 and 2019 she had normal examinations except for some flank tenderness. In 2020 she had tenderness of the spine and a reduced range of motion, but other records showed plaintiff with a normal range of motion, no tenderness, and normal strength, gait, and sensation. Debra also reported to the doctor that she was able to participate in a variety of activities, including caring for her family, and cooking and cleaning. The ALJ concluded that Dr. Dragovich's opinion was inconsistent with the record as a whole. R. 27. The ALJ followed the regulations and explained why he found Dr. Dragovich's opinion as to Debra's ability to do work-related activities to be unpersuasive.

Debra asserts that Dr. Dragovich's opinion was consistent with his treatment notes as well as other evidence in the record, but the only evidence she points to is that Debra often had tenderness over her flanks. ECF No. 14 at 25. As the ALJ explained, that was often the only clinical finding as to pain in the record and did not support the conclusion that Debra was incapacitated by pain.

Debra also points to the fact that at times her kidney impairment resulted in kidney stones that required treatment at the hospital and that the record shows she has had several procedures. Id. The record indicates that during the relevant time period, from February 14, 2018, through the date of the second administrative hearing on July 7, 2022, Debra went to

23

the emergency department three times with pain from kidney stones. On the first two occasions, she was able to pass the stones either in the emergency room or at the urology clinic. At her last episode in 2022, she was hospitalized overnight and did require placement of a stent, dissolution of the stone with a laser, and removal of the stent, which required two follow-up visits to the urology clinic for treatment. The ALJ considered this evidence but nevertheless concluded that Debra's treatment has been essentially routine, conservative, and successful. R. 22–24.

In response to this finding by the ALJ, Debra argues that the ALJ attempted to minimize her treatment as minimal and merely routine and conservative in order to undermine Dr. Dragovich's opinion regarding the severity of Debra's pain. ECF No. 14 at 25. This argument is not persuasive.

The term "conservative treatment" is not defined in the regulations but appears to encompass treatments that are less invasive than surgery. See Wilson v. Colvin, No. 6:16-CV-06509-MAT, 2017 WL 2821560, at *6 (W.D.N.Y. 2017) (describing chiropractic treatment, physical therapy, and epidural injections as "relatively conservative" treatments); Knorr v. Colvin, No. 6:15-cv-06702 (MAT), 2016 WL 4746252, at *14 (W.D.N.Y (2015) (characterizing physical therapy, a TENS unit, medication, palliative injections, and chiropractic adjustments as conservative treatment); Cutcher v. Comm'r of Soc. Sec. Admin., No. 4:14-CV-1958, 2015 WL 5233244, at *7 (N.D. Ohio 2015) (internal citation omitted) (finding radiofrequency ablation, medications, and physical therapy are conservative treatments); Sutton v. Astrue, No.

07-569-GMS, 2009 WL 2982879, at *4 (D. Del. 2009) (reciting state agency physician's description of physical therapy, medications, and epidurals as conservative treatment).

During the relevant time period, Debra has primarily been treated with medication for pain, which is generally considered "conservative treatment." During her first two trips to the emergency room for kidney stones, she also was treated with medication. When she was treated for stones in 2022 with stents and a laser, those treatments, regardless of whether they can be considered "conservative," still amounted to three visits to an emergency department and urology clinic over the course of a month and were successful in eliminating the kidney stone. There is no indication that Debra suffered long-lasting incapacity from the procedures.[10]

The court finds no error in the ALJ's description of Debra's treatment as essentially routine, conservative, and successful. Nor does the court find error in the ALJ's determination that Dr. Dragovich's opinion as to her work-related functions was unpersuasive.

### C. Subjective Allegations of Pain and Limitations

Debra also contends that the ALJ did not properly assess her subjective complaints of pain and limitations. When evaluating a claimant's reported symptoms, the ALJ first considers whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's symptoms. Once an underlying

---

[10] Patients who undergo laser treatment for stone removal are advised that while they may experience pain after the surgery, they can resume normal activities the next day or as soon as they feel comfortable.https://www.urologyhealth.org/healthy-living/care-blog/2018/a-patients-guide-to-laser-treatment-for-urinary-stones (last viewed Feb. 15, 2024).

physical or mental impairment is established, the ALJ evaluates the intensity and persistence of symptoms to determine the extent to which the symptoms limit a claimant's ability to perform work-related activities. SSR 16-3p, 2017 WL 5180304, at *3–4. In making the second determination, the ALJ first looks at the objective medical evidence. Id. at *5. If the ALJ cannot make a disability determination that is fully favorable based on objective medical evidence, other evidence, such as statements from the claimant, medical sources, and other sources are considered. Id. at *6.

However, statements about symptoms alone will not establish disability. 20 C.F.R. § 404.1529(a).

> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

Id. In Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 95 (4th Cir. 2020), the Fourth Circuit reiterated that "'while there must be objective medical evidence of some condition that could reasonably produce the pain there need not be objective evidence of the pain itself or its intensity.'" Id. at 95 (citing Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); and Hines v. Barnhart, 453 F.3d 559, 564–65 (4th Cir. 2006)).

In this case, the ALJ acknowledged that Debra's impairments could cause her pain or other difficulty. R. 23. But, as discussed above, he found that her statements as to the level of

pain and difficulty were inconsistent with the fact that she received routine care at the pain management clinic where she often indicated that she was doing well and that she was able to do household activities, care for her family, and stay active. She reported a 50 percent decrease in pain with use of the medication and she reported symptom improvement to her urologist. The ALJ credited the findings of flank pain, occasional back tenderness and decreased range of motion by limiting her to light work with additional postural limitations and the anticipation that she would be absent from work one day a month.

Debra argues that although the ALJ pointed to her performance of daily activities, he did not consider the extent to which she performed them. Debra testified that her parents help her as needed with childcare and household chores and with activities that require stooping, which increases her pain. Debra also stated that she only cooks dinner a few times per week and prepares muffins for breakfast even less often. She said that when doing household chores, she sometimes gets midway through the chore and has to stop and rest because she does not have energy or cannot stay on track.

Debra argues that this case is like Arakas, where the court observed the following:

> A claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities. As one of our sister circuits aptly observed, "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons ..., and is not held to a minimum standard of performance, as she would be by an employer." Bjornson [v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012)]. Furthermore, as we emphasized in Lewis [v. Berryhill, 858 F.3d 858 (4th Cir. 2017)], "disability claimants should not be penalized for attempting to

> lead normal lives in the face of their limitations." <u>Lewis</u>, 858 F.3d
> at 868 n.3 (quoting <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir.
> 1998)). Being able to live independently and participate in the
> everyday activities of life empowers people with disabilities and
> promotes their equal dignity. In pursuing those ends, disability
> claimants should not have to risk a denial of Social Security
> benefits.

<u>Arakas</u>, 983 F.3d at 101.

In <u>Arakas</u>, the ALJ misstated the claimant's testimony about how many hours a week she worked at her sister's restaurant and omitted her qualifying statement that she had a lot of problems using her right hand, had to wear a wrist brace, and that she worked very slowly because she could no longer feel money in her hands. <u>Id.</u> at 98. In addition to improperly disregarding her qualifying statements, the ALJ failed to adequately explain how her limited ability to carry out daily activities supported his conclusion that she could work an 8-hour workday. <u>Id.</u> at 99.

Similarly, in <u>Woods v. Berryhill</u>, 888 F.3d 686 (4th Cir. 2018), the ALJ noted that the plaintiff could maintain her personal hygiene, cook, perform light household chores, shop, socialize with family and attend church on a regular basis. But the ALJ did not consider the claimant's statements that she could not button her clothes, had trouble drying herself after bathing, sometimes needed help holding a hairdryer, could prepare simple meals but had trouble cutting, chopping, dicing, and holding silverware and cups, that it took her all day to do laundry, she only shopped for necessities and it took longer than normal, that when she read to her grandchildren they had to turn the pages of the book because of the severe pain in her hands, and that on some days, she spent the entire day on the couch. <u>Id.</u> at 694–95. The

28

court made clear that an adjudicator cannot consider only the type of a claimant's daily activities, but also must consider the extent to which she can perform them. Id. at 695.

The ALJ in this case properly assessed Debra's subjective complaints. He recited the factual allegations she made in function reports, including the limited nature of her household activities, that she would often lie down in the afternoon, that her mother helped with childcare and chores around the house, and that her ability to walk was limited. R. 21. The ALJ also acknowledged her hearing testimony that she had difficulty performing daily activities. R. 22. However, unlike the claimants in Arakas and Woods, there are multiple notes in the record, cited by the ALJ, where Debra told her medical providers that she was doing very well, was able to take care of herself and her family, did not have any complaints, was active and had lost weight, and could perform activities of daily living, household chores, and errands without significant difficulty from pain or other symptoms. R. 22–23. The ALJ in Debra's case did not mischaracterize or ignore her subjective complaints. Rather, he addressed and resolved conflicts in the evidence, i.e., between what she told her providers and what she stated on function forms and how she testified at her hearings. The court finds no error in the ALJ's assessment of Debra's subjective allegations of her limitations.

**V. Conclusion**

The court concludes that the ALJ in this case carefully and thoroughly explained how he reached his conclusions, and that he "built a logical bridge" between the evidence in the record and his conclusions. The court is not left to guess at how he reached his conclusion that Debra is not disabled and his determination is supported by substantial evidence in the

29

record. Accordingly, the court **DENIES** Debra's motion for summary judgment, ECF No. 13 and **GRANTS** the Commissioner's motion for summary judgment. ECF No. 18. The final decision of the Commissioner that Debra is not disabled is **AFFIRMED**.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: March 4, 2024

Michael F. Urbanski
Chief United States District Judge